# EXHIBIT A

Firm e-mail address: walkerassistant@aol.com

William G. Walker, Esq.
WILLIAM G. WALKER, P.C.
177 N. Church Avenue, Suite 700
Tucson, AZ 85701
Telephone: (520) 622-3330
wgwpc@aol.com
PCCN: 60292
SBN: 005361

Steven P. Sherick, Esq.
SHERICK & BLEIER, P.L.L.C.
222 N. Court Avenue
Tucson, AZ 85701
(520) 318-3939
steve@sherickbleier.com
Attorney Nos. 006031/52484

Attorneys for Plaintiff

COPY
OCT 19 2010
PATRICIA A. NOLAND
CLERK, SUPERIOR COURT

RECEIVED
DEC 27 2010
AG/CIV-LMS (TUCSON)

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PIMA

MARCUS HEMINGTON, a single man,

Plaintiff,

vs.

THE ARIZONA BOARD OF REGENTS, governing body of the UNIVERSITY OF ARIZONA, an agent of the State of Arizona; MELISSA VITO, Vice President for Student Affairs, University of Arizona, in her official and individual capacities; KEITH B. HUMPHREY, Assistant Vice President for Student Affairs, University of Arizona, in his official and and individual capacities; JASON CASARES, Assistant Dean of Students, University of Arizona, in his official and individual capacities.

Defendants.

No: C20108197

COMPLAINT

(Unlawful Discrimination Pursuant to 42 U.S.C. § 1983; Breach of Contract; Unlawful Discrimination in Violation of the Arizona Constitution; Negligent and Gross Negligence; Intentional Infliction of Emotional Distress

( Ted B. Borek )

Plaintiff alleges as follows:

## INTRODUCTION

This is an action brought by Plaintiff for violation of his civil rights, pursuant to 42 U.S.C. § 1983, for violations of the Arizona Constitution, Art. 2, §5, for violations of his rights to due process under the U. S. and Arizona Constitutions, and for breach of contract, negligence, gross negligence, and intentional infliction of emotional distress against Defendants. Plaintiff also seeks punitive damages where appropriate.

## PARTIES

1. Plaintiff, Marcus Hemington, was at all times relevant hereto a student at the University of Arizona in Pima County, Arizona. He is, and was at all times relevant hereto, a single man.

2. The Arizona Board of Regents is the governing body of the University of Arizona and a representative of the State of Arizona in all matters relevant hereto.

3. Melissa Vito (hereinafter "VITO") is, and was at all times relevant hereto, Vice President of Student Affairs for the University of Arizona in Pima County, Arizona. She makes final decisions for the University of Arizona and the Board of Regents in administrative matters concerning alleged violations of the Student Code of Conduct and is sued in her official and individual capacities.

4. Keith B. Humphrey (hereinafter "HUMPHREY") is presently the Assistant Vice President of Student Affairs at the University of Arizona and was at all times relevant hereto an Associate Dean of Students at the University of Arizona, Pima County, Arizona and is sued in his official and individual capacities.

5. Jason Casares (hereinafter "CASARES") is, and was at all times relevant hereto, an Associate Dean of Students at the University of Arizona, Pima County, Arizona and is sued in his official and individual capacities.

6. CASARES, HUMPHREY and VITO are, upon information and belief, single persons with no marital communities. If married, Plaintiff will seek to amend this Complaint to allege that the actions of each as alleged herein were for the benefit of their

marital communities.

## GENERAL ALLEGATIONS

7. All acts alleged herein occurred in Pima County, Arizona.

8. On November 3, 2008, Plaintiff received a Notice of Interim Suspension of his status as a student at the University of Arizona. He was ordered to contact Assistant Dean of Students Jason CASARES "within the next five business days" to answer charges that he engaged in the following conduct: "Reportedly on or around October 23, 2008, you sexually assaulted and compromised the personal safety of a University student."

9. Plaintiff and his father called Assistant Dean CASARES, met with him, and gave a full statement regarding the acts in question. Plaintiff and his father also provided names of witnesses to corroborate Plaintiff's version of events.

10. On December 12, 2008, attorney Steve Sherick sent a letter to CASARES with summaries of statements of numerous witnesses corroborating Plaintiff's version of the events. On Plaintiff's behalf, attorney Sherick denied each allegation against the Plaintiff and attached statements of the corroborating witnesses.

11. On February 17, 2009, Plaintiff received a letter from CASARES indicating that, as a result of his investigation, CASARES had made the following determination: "Ms. [Jane Doe] was not in a state to give consent regarding a sexual act because of her impairment due to incapacitation." Based upon this finding, CASARES concluded that Plaintiff had violated Student Code of Conduct Prohibited Items No. 2, 15, 17 and 23. The letter indicates that, among other things, CASARES considered "medical documentation by the victim" in making his decision.

12. On February 27, 2009, attorney Sherick filed Plaintiff's Notice of Appeal. Contained in his notice, sent to Associate Dean of Students Keith B. HUMPHREY, is Sherick's request as follows: "I would request that I be provided access to all information compiled during Mr. Casares' investigation in this matter including but not limited to: . . . photographs, videos, and the reports and results of any scientific or medical examinations."

13. In response to Sherick's letter of February 27, 2009, Associate Dean of Students HUMPHREY, also on February 27, set a tentative hearing date on Plaintiff's request for appeal for May 1, 2009, from 8:30 a.m. to 5:00 p.m. He further scheduled an exchange of materials between the parties to take place at 4:00 p.m. on Thursday, April 23, 2009. He proposed the substance of a written communication to potential Board members, and requested suggestions concerning the communication from Plaintiff's counsel. Additionally, he forwarded Sherick's request for a copy of CASARES' file directly to CASARES.

14. On March 2, 2009, attorney Sherick proposed additional language to the written communication with prospective Board members. Among other things, Sherick proposed that the prospective Board members be questioned regarding "whether they have been a victim of or accused of sexual misconduct." He said that he believed that those experiences might affect whether panel members could fairly hear the evidence in this case.

15. Despite repeated requests by Sherick for photographs, videotapes and medical reports, none of these items were ever provided in a timely fashion so Sherick could do any investigation of them or preparation concerning them for the hearing. He received cursory medical records at the hearing, but none that allegedly formed the basis for CASARES' conclusions. He was able to view copies of a videotape and photographs, which were admitted at the hearing, but he was never allowed copies for his own use or investigation. The University's failure to provide these items deprived Hemington of due process in the University proceedings.

16. The request for additional questioning of Board members by Sherick was never adopted.

17. On March 3, 2009, after having been informed by HUMPHREY that the notice would not contain any of Sherick's requested changes, Sherick preserved his objections and made a request that he be permitted to inquire of the Board, once they were chosen, concerning whether they had "knowledge or association which would make them ineligible

to serve."

18. On March 3, 2009, Associate Dean HUMPHREY assured Sherick that "we will work, as always, to screen out any individuals who have knowledge of the situation as it is my role to provide Mr. Hemington with as fair a hearing as possible." He never addressed Sherick's request to question the Board members either before or after they were chosen concerning their experiences with prior sexual misconduct.

19. On March 13, 2009, Associate Dean HUMPHREY sent the formal memorandum concerning the University hearing on Plaintiff's appeal. The memorandum, sent to Plaintiff, appointed professor Susan Knight, School of Journalism, as the Chair of the five-person panel.

20. On April 20, 2009, the parties exchanged disclosure materials for the Board hearing. The University disclosed that it was providing "the following materials for your review in the Student Code of Conduct case involving Mr. Marcus Hemington." Nowhere in the University disclosure materials was there any disclosure of the file of Dean CASARES, nor were there any materials which included videotapes, pictures or medical records which CASARES claimed to have reviewed in reaching his decision. In its disclosure, the University indicated its intent to call 16 witnesses, in addition to "any witnesses listed by Mr. Marcus Hemington or his advisor."

21. In the disclosure provided by Marcus Hemington, Plaintiff evidenced his intent to call 15 potential witnesses. Additionally, the University submitted a 14-page exhibit entitled "Sexual Assault: Overview." The exhibits consisted of incorrect definitions of sexual assault and clearly prejudicial material. These materials were given to the Board prior to the hearing.

22. On April 23, 2009, Associate Dean HUMPHREY sent a memorandum to the Board members, indicating the accusations against Plaintiff Hemington and announcing that the hearing would take place on May 1, 2009, and would begin at 8:30 a.m. The hearing notification indicated that the University would call 16 witnesses and that Mr. Hemington

would call an additional 9 witnesses. The hearing notification also indicated that the Dean's exhibits would consist of six exhibits. No videotapes, photographs or medical records were listed as exhibits in support of the University's case.

23. On April 23, 2009, Plaintiff's counsel submitted four motions for the Board's consideration. Included in the motions were Plaintiff's argument that the University was employing an improper legal standard in determining whether or not a sexual assault occurred; that the University had provided no specifics concerning the allegations against the Plaintiff, denying him due process of law and proper notice as to the charges against him; and, that the Board materials submitted to CASARES and in support of the hearing contained no evidence whatsoever that Plaintiff ever caused physical harm or threatened to cause physical harm to the alleged victim. Plaintiff's counsel also submitted proposed legal instructions to the Board which properly stated the law concerning points at issue in the hearing.

24. On April 29, 2009, the University responded to Plaintiff's motions, requesting that they be denied for various reasons. On April 29, 2009, Susan Knight, Chairperson of the University Hearing Board, refused to consider the motions of Plaintiff's counsel, alleging that "our student disciplinary proceedings do not allow for any motions to be filed in advance of the University Hearing Board." On April 30, 2009, Plaintiff's counsel replied to Chairperson Knight by pointing out that, as the Chair of the Hearing Board, Knight did have the authority, pursuant to Rule 5-403(D)(4)(6), to rule on all procedural matters. He reminded the Chair that the Student Disciplinary Procedures are "intended to ensure substantive and procedural due process for the students."

25. On April 30, 2009, Plaintiff's counsel sent a letter to the University, indicating that he had just received a copy of an affidavit from a former roommate of the alleged victim. He indicated that the affidavit would provide evidence at the hearing from an additional witness. He attached the affidavit to his letter. The affidavit was subsequently ruled inadmissible by the Chair on the grounds that it was irrelevant and disclosed too late to be

used at the hearing.

26. These rulings concerning the affidavit and its admissibility were clearly contradictory to other rulings of the Chair at the hearing which permitted admission of photographs, videotapes, and testimony of the alleged victim from medical and hospital records which were never disclosed to the Plaintiff or his counsel until they were shown to the Board during the hearing. The Affidavit offered by Plaintiff's counsel was also ruled irrelevant by the Board Chair, despite clear references to the character of the alleged victim, her propensity for drinking, and her wild and erratic behavior in the past, all of which contradicted the alleged victim's direct testimony. The Board Chair disallowed this evidence on grounds of relevancy, while permitting the alleged victim and friends to testify that her acts on the night in question were inconsistent with her character and with her behavior on other occasions.

27. The University of Arizona Student Code of Conduct hearing Re: Marcus Hemington commenced in the Agave Conference Room, El Portal, on the University campus, on May 1, 2009. Despite an announced start time of 8:30 a.m., the hearing did not begin until almost 9:00 a.m., 30 minutes later. The Court began the hearing by announcing, for the first time, that the hearing had to be finished on May 1, 2009, "because it is very unlikely that we will be able to convene these five people again in this matter."

28. Without any advance notice, the Chair announced that "the Board had decided to limit the testimony on the character of Mr. Hemington and Ms. [Jane Doe] to one character witness per side. The hearing transcript runs 739 pages. Of that total, 624 pages were devoted to introductory matters and the presentation of the University's case. Despite listing 15 witnesses to be called by the University, the University subsequently called 5.

29. During the University's presentation of the case, they were permitted to show the Board explicit videotapes of the activities of the Plaintiff and the alleged victim together on the night in question. They were also permitted to show still pictures of the Plaintiff and the alleged victim during relevant times at issue on the night in question. Plaintiff requested, but

was never provided with, copies of these items.

30. The videotapes and still pictures were admitted into evidence at the hearing and marked as exhibit 2. No copies were permitted to the Plaintiff or his counsel, either prior to the hearing or at the hearing itself.

31. During the University's case, the alleged victim was called as a witness. The alleged victim was permitted to testify concerning a number of issues that had never been disclosed to the Plaintiff or his counsel. For example, the University proffered testimony from the alleged victim concerning her phone records, the videotape and photographs previously mentioned, and medical records. The alleged victim, upon questioning from the University attorney, disclosed these items of physical evidence during her testimony for the first time. When Plaintiff's counsel objected to the late disclosure of these items, the University attorney suggested that "we give Mr. Sherick ample time to review the materials that have been produced today . . . ." The Chair indicated its disappointment at the late production of these items as well.

32. Eventually, an agreement was reached with the Board that the alleged victim would be permitted to testify concerning only those items and facts that were supported by the medical records which she brought.

33. Shortly after that ruling by the Chair, the alleged victim testified as to matters that had never been disclosed and were not part of the original agreement. Without any foundation in the medical records, or any connection whatsoever to her encounter with Plaintiff, the alleged victim was permitted to testify that she found out shortly after her encounter with the Plaintiff that she had a sexually transmitted disease, human papillomavirus (HPV). Despite the vigorous objection of Plaintiff's counsel to the admission of this testimony with no foundation in the medical records and no advance disclosure, the Board Chair overruled the objection and admitted the evidence.

34. Sometime shortly after noon, the Chair indicated that the hearing had now been going on for a little over three hours and it had been exclusively the presentation of the

Dean's case. The Chair suggested that they may have to limit the testimony and have Mr. Hemington testify soon in the afternoon because if they waited until the end of the day, people are going to be tired and "we're just not gonna make it through that list."

35. To this suggestion, Plaintiff's counsel indicated that he was "very concerned" and felt that there was "a lot of important information that needs to be brought forward for Mr. Hemington." The Board responded that an alarm goes off in the building at 5:00 p.m. and they needed to complete the hearing before 5:00 p.m. and "hustle out of here." Finally, the Board indicated that from the present time (12:47 p.m.) until 1:30 p.m., the Board would watch the videotape and view the pictures and then Mr. Sherick could continue with his questioning of the alleged victim for 15 minutes. The Board Chair then said she would permit the Dean's Office to call remaining witnesses from 2:15 p.m. to 2:30 p.m. Mr. Skolnik agreed and said, "We'll go fast."

36. The Chair indicated that Mr. Sherick would then have two hours, until 4:30 p.m., to call Mr. Hemington "as well as any other witnesses he wants to call." She then gave each of the sides seven to 10 minutes for closing arguments. Mr. Sherick indicated that even after cutting down his presentation, he had five witnesses whom he wished to call, given the ruling of the Chair.

37. During the cross-examination of the alleged victim, Plaintiff's counsel sought to impeach her testimony. The impeachment was in the form of an affidavit from the alleged victim's former roommate. The affidavit also gave information concerning the character of the alleged victim, her behavior when highly intoxicated on previous occasions, and her propensity for untruthfulness.

38. In complete contradiction to her previous rulings, the Chair, upon objection of the University that the disclosure of the affidavit had come "late," refused to admit the affidavit, stating as follows:

> CHAIR KNIGHT: Well, I would like this to just move on because that document came in late, and I don't see how her freshman roommate is relevant.

39. As the hearing proceeded, the Chair continued to make inconsistent rulings concerning the ability of Plaintiff to present evidence concerning the character of the alleged victim and her past conduct. The Chair permitted the University's other witnesses to testify that the alleged victim's actions were "out of character," at the same time denying the affidavit of Hemington's witness.

40. Despite the presence of a number of witnesses the Plaintiff planned to call, time was severely limited, and Plaintiff's lawyer was forced to eliminate testimony and witnesses who would have supported a proper defense in the case.

41. Throughout the afternoon, Chair Knight continued to push the Plaintiff to cut witnesses to finish his case. At the conclusion of the hearing, all were hustled out of the conference room because of the claim that the building had to be abandoned at the 5:00 p.m. deadline.

42. On May 5, 2009, the Chair issued a Report of the Hearing Board concerning the matter at issue. On the charges relating to consuming and distributing alcohol and engaging in off-campus conduct that a reasonable person would believe may present a risk or danger to the health, safety or security of campus residents, the Hearing Board found that Plaintiff's "admission to drinking excessively, continuing to drink at La Cocina, and sharing his flask with the alleged victim violated these . . . items in the Code of Conduct." Regarding the more serious charges of endangering, threatening, or causing physical harm to any member of the University community or to oneself, causing reasonable apprehension of such harm, or engaging in conduct or communications that a reasonable person would interpret as a serious expression of intent to harm, and engaging in an illegal sexual offense, the Board concluded that there was not enough evidence to prove that these violations of the Code of Conduct more than likely occurred.

43. The hearing Board then found that the recommendation of the sanctions for the Plaintiff were too harsh, and that his two-year suspension should be reduced to a one-year suspension in part because of Hemington's failure to attend an alcohol education class that

was mandated after a previous alcohol infraction in his residence hall earlier in his years at the University of Arizona.

44. Upon receiving the recommendation, Vice President VITO remanded the case to the Board to consider five questions. The Board's answer to all five questions supported the Board's initial findings.

45. Upon receiving the answers, Vice President VITO remanded to the hearing Board again to answer a single question.

46. In response, the Board communicated to Dr. VITO the reason for its vote on the question remanded.

47. On June 12, 2009, Vice President VITO responded to the letter of the Board, pressing them to deliberate on the question enclosed. She informed them of her opinion of the legal standard to be applied, which was in opposition to the legal standard which Plaintiff's counsel had urged from the beginning.

48. On June 18, 2009, Professor Knight communicated to Dr. VITO that "after considering the legal meaning of 'reasonably known,' the Board concludes [4-1] that YES, Marcus Hemington should reasonably have known that [Jane Doe] was incapable of giving consent to sexual intercourse at the time of the incident." The letter from Professor Knight did not indicate that the Board reconvened or deliberated on this issue whatsoever.

49. On July 17, 2009, Vice President VITO rendered her opinion in the case.

50. In Vice President VITO's letter, she adopts 18 separate "facts established by the record" from the hearing. She agreed with the Hearing Board in finding the Plaintiff guilty of violations of Items No. 15, 16 and 17 of the Code of Conduct.

51. On December 17 and 18, 2009, Mr. Hemington's appeal was heard by the Superior Court of the State of Arizona. At that hearing, there were no time limits on Mr. Hemington's ability to present witnesses and evidence on his own behalf.

52. Prior to the hearing, Mr. Hemington was able to conduct discovery and be in possession of information which was denied to him prior to and at the Board hearing. As a

result of the evidence which Mr. Hemington was permitted to procure and present, and after reviewing the evidence that was presented at the hearing on behalf of the University, the Superior Court found that there was not substantial evidence to support claims of sexual assault against Mr. Hemington. The Court remanded the case to Vice-President VITO with an admonition that the remaining charge against Mr. Hemington, that he had provided alcohol to the alleged victim, did not warrant a suspension.

53. Both the Board and Vice President VITO found, as a predicate for the suspension in this case, that Plaintiff Hemington violated Item 16 of the Code. The charging document setting the University hearing date and informing the Plaintiff of the charges against him did not contain an allegation that he violated Item 16 of the Code. It appears from the record that the University has found the Plaintiff guilty of a violation of the Code for which they did not charge him.

54. On April 21, 2010, Vice-President VITO formally rescinded any additional punishment to Hemington and voided his suspension.

55. The University, and each individual named above, failed to conduct an adequate investigation into the events of October 22-23. Dean CASARES, who conducted the initial investigation in this case, failed to collect available evidence, both before and after Hemington's interim suspension.

56. On information and belief, the Defendants had no written or oral policies or procedures for conducting investigations into violations of the Student Code of Conduct.

57. Also on information and belief, neither CASARES, HUMPHREY nor VITO had received appropriate training on conducting investigations into alleged violations of the Student Code of Conduct.

58. Although CASARES apparently met with the alleged victim in excess of ten times, and claimed to have supported his decision based in part on reviewing the alleged victim's "medical records," he permitted the alleged victim to produce only a minuscule

portion of her medical records without ever asking for her complete records.

59. Under the Student Code of Conduct, CASARES could have required her to produce all of her medical records as part of her cooperation with the investigation. He never did so.

60. Had Dean CASARES received all of her medical records, he would have found that claims made by her concerning her medical condition as a result of the activities of October 22-23 were materially false.

61. When counsel for Mr. Hemington was finally permitted, by Superior Court Order, to obtain the medical records of the alleged victim. The records indicated that the alleged victim did not have "vaginal lesions on her ovaries" as she testified to at the hearing. The medical records also did not establish, as alleged by her, that she had contracted HPV from her encounter with Hemington.

62. The counseling records reveal that the alleged victim, over six months after the allegations were made by her to the University, told a counselor at a session that she was raped by fraternity members at a fraternity party.

63. Additionally, CASARES and other University personnel responsible for the investigation of this case failed to interview appropriate witnesses, failed to collect essential material, and failed to appropriately investigate this case as neutral fact finders. For example, Dean CASARES requested that the alleged victim memorialize in her own words what happened to her on the night in question. Although the alleged victim did, in fact, create a document detailing the events, and met with CASARES multiple times after the document was created, CASARES never required her to turn it over to the University as part of the investigation.

64. Additionally, Defendants acknowledged that there were videotapes and pictures taken on the night in question which would have been extremely helpful to Marcus Hemington's defense against the charges. The videos and pictures showed an intimate relationship between Hemington and the alleged victim on the night in question. They

showed that the alleged victim amorously pursued Hemington and was the aggressor early in the evening before the parties had sexual intercourse. They were the only actual evidence of the mental and physical state of the alleged victim at times when she claimed she was not capable of giving consent to engage in sexual acts.

65. No one from the University required the alleged victim to produce these videotapes and pictures prior to the hearing before Vice-President VITO. In fact, the alleged victim was permitted to bring these items to the hearing, unexamined by Hemington or his counsel, and present them for the Board's consideration. The pictures and videotape, despite being considered by the Board and shown at the hearing, were not made part of the University's Record on Review. When Hemington's counsel was finally permitted to obtain a copy of the videotape and pictures, shortly before the Superior Court hearing, Hemington was able to debunk claims of the physical and mental state of the alleged victim by presenting an expert toxicologist who had foundation for his testimony.

66. In issuing Hemington's interim suspension, the University incorrectly applied the wrong legal standard in finding that Mr. Hemington sexually assaulted the alleged victim. Dean CASARES, in issuing the interim suspension, indicated as follows:

> Ms. [Jane Doe] was not in a state to give consent regarding a sexual act because of her impairment due to incapacitation.

67. Prior to the hearing in this matter, counsel for Mr. Hemington made numerous requests for discovery, none of which were entertained. He repeatedly asked for copies the videotape and pictures. He never viewed them until the day of the hearing. Despite their late production, the hearing Board allowed their use without any advance notice to Mr. Hemington or his counsel.

68. Mr. Hemington's counsel also requested that prospective Board members be questioned about their ability to be impartial in the case. Specifically, he asked that potential Board members be questioned about their own connections with sexual assault cases. The University refused to inquire in this area. As a result, the Board hearing was chaired by a

University employee who revealed during deliberations to other Board members that she had personally been a rape victim and that, as a result of her experiences, she knew that the claims of the alleged victim must be true regardless of the circumstances.

69. At the University hearing, the Chairperson refused to admit relevant evidence concerning the character of the alleged victim and past instances of her relevant conduct. While she permitted witnesses for the University to testify about the character of the alleged victim, she ruled contrary evidence proffered by Hemington's counsel as irrelevant. She also admitted testimony and evidence on behalf of the University which had never been disclosed to Mr. Hemington's counsel, while denying relevant evidence which Mr. Hemington's counsel proffered on the grounds that it was not disclosed timely.

70. After the Board's initial decision was submitted to Vice-President VITO, she remanded the case to the Board for additional findings of fact. Hemington's counsel filed a written request to address the issues which had been remanded, but was told by Dean HUMPHREY that the written communication from Mr. Hemington's counsel would not be submitted to VITO for consideration. During her deliberations, VITO took the almost unprecedented action of continually remanding to the Board until she received satisfactory answers to uphold her ultimate decision in this case. In discovery prior to the Superior Court hearing in this case, Hemington's counsel discovered that there were secret communications between members of the Board and University personnel which had never been disclosed on the record prior to Melissa VITO's final decision.

71. The conduct of the Defendants, in failing to disclose or make part of the record the "secret communications" that Melissa VITO had with the Board, was deliberate and malicious.

72. At the hearing, Hemington was not permitted to present his witnesses and evidence in a full and fair fashion. The record demonstrates that the University arbitrarily set a 5:00 p.m. deadline on closing the hearing. This was in utter disregard for the evidence to be presented on Hemington's behalf, since the deadline continued to get pushed up as the

University used more time to present its case. At various times, Hemington's counsel was given extremely short times to cross-examine witnesses, to present witnesses or to review evidence which was produced for the first time at the hearing. The result was a chaotic hearing at which Hemington was not given an equal opportunity with the University to present his witnesses and evidence.

73. Even after Hemington was permitted by the Superior Court to present evidence that the alleged victim told inconsistent stories to others, lied about her medical condition to the University and to Hemington, and selectively hid evidence which was not favorable to her, the University continued to support her and argue to the Superior Court that Hemington's suspension and ancillary consequences should be upheld. At this point, Vice-President VITO acted in bad faith in not conceding that if the evidence were available to her, she would have changed her opinion. Instead of urging the Superior Court to remand for further consideration in light of the new evidence, the University held staunch to its position that Hemington should be suspended. There was no further consideration of any punishment for the alleged victim, who by this time was known to have lied about her medical condition and told inconsistent stories about what happened to her on the night in question.

74. In addition to the allegations above, it is apparent that University personnel did not properly supervise and/or train Dean CASARES in proper investigative techniques in this and other cases. CASARES' investigation was haphazard, overtly favorable to the alleged victim, and not reasonably susceptible to a fair investigation of the facts.

75. Upon Plaintiff's appeal to the Pima County Superior Court, the findings of the University concerning violations of Student Code of Conduct numbers 2, 16 and 23 were reversed, and the case remanded to the University for further proceedings.

76. Eventually, Plaintiff Hemington's suspension was vacated by Defendant VITO.

77. The acts of the Defendants alleged herein were done recklessly, willfully, and without regard for the rights of the Plaintiff.

**COUNT ONE**

**(Unlawful Discrimination Under 42 U.S.C. §1983)**

78. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-77 above.

79. All conduct alleged herein by Defendants was done under color of state law.

80. By the actions described above, Defendants have deprived Plaintiff of the rights, privileges, and immunities secured by the United States Constitution and laws.

81. By the conduct describe above, Defendants have denied Plaintiff substantive and procedural due process of law and freedom of association, all guaranteed by the First and Fourteenth Amendments to the United States Constitution.

82. As a result of Defendants' conduct, Plaintiff has suffered emotional, physical and monetary damages.

**COUNT TWO**

**(Breach of Contract)**

83. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-82 above.

84. Plaintiff, by paying tuition and fees to the State of Arizona for attendance at the University of Arizona, contracted and agreed with Defendants that they would provide an educational opportunity for him and treat him in a fair and equitable manner.

85. By contracting with Plaintiff, Defendants owed a duty of good faith and fair dealing to the Plaintiff.

86. By the acts aforementioned, Defendants breached their duty of good faith and fair dealing and breached their contract with Plaintiff.

87. As a result of Defendants' conduct, Plaintiff has suffered emotional, physical and monetary damages.

**COUNT THREE**

**(Unlawful Discrimination in Violation of the Arizona Constitution)**

88. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-87 above.

89. By their conduct aforementioned, Defendants violated Plaintiff's rights to substantive and procedural due process and freedom of association as guaranteed by the Arizona Constitution.

90. As a result of Defendants' conduct, Plaintiff has suffered emotional, physical and monetary damages.

**COUNT FOUR**

**(Negligence and Gross Negligence)**

91. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-90 above.

92. Defendants, at all relevant times hereto, owed Plaintiff a duty to treat him fairly and in accordance with their responsibilities under the Student Code of Conduct.

93. Defendants performed their duties negligently and with gross negligence.

94. As a result of Defendants' conduct, Plaintiff has suffered emotional, physical and monetary damages.

**COUNT FIVE**

**(Intentional Infliction of Emotional Distress)**

95. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-94 above.

96. The acts of the Defendants aforementioned constitute intentional infliction of emotional distress upon Plaintiff.

97. As a result of Defendants' conduct, Plaintiff has suffered emotional, physical and monetary damages.

WHEREFORE, Plaintiff prays for the following relief:

1. Trial by jury on all issues;

2. Compensatory damages for the Defendants' violations aforementioned;

3. Punitive damages against individually named Defendants for their reckless, willful and wanton conduct;

4. Attorney's fees and costs pursuant to 42 U.S.C. § 1988;

5. Attorney's fees and costs pursuant to A.R,S. §12-341;

6. For any and all further relief deemed reasonable under the circumstances.

DATED this ~~19th~~ 19th day of October , 2010.

SHERICK & BLEIER, P.L.L.C.

By Steven P. Sherick

Steven P. Sherick

WILLIAM G. WALKER P.C.

Steven P. Sherick for

William G. Walker
Attorneys for Plaintiff